## O. P. TAYLOR V. THE STATE.

*No. 7276.    Decided May 13.*

1. **Indictment—Description of Property.**—A general description of property in an indictment by name, kind, quantity, number, and ownership, is sufficient.

2. **Same—Embezzlement—"Property."**—With respect to the offense of embezzlement, the word "property" includes any and every article commonly known and designated as personal property, and all writings of every description that may possess any ascertainable value.    This includes money.

3. **Same—"Money."**—When not defined specially by statute, the term "money" means only legal tender metallic coin, or legal tender currency of the United States; but with reference to the offense of embezzlement the term is specially defined.by statute, and it includes, besides gold, silver, copper, or other coin, bank bills, government notes, or other circulating medium current as money.

4. **Same.**—In this case the indictment charges the embezzlement of "certain money belonging to A. E. Sanders, viz., $2000, said money being of the value of $2000." *Held*, that this was a sufficient description of the money, and that under this description the State might prove the embezzlement of gold, silver, copper, or other coin, bank bills, government notes, or other circulating medium current as money.

5. **Same—Surplusage.**—Unnecessary words and allegations do not vitiate an indictment, and may be rejected as surplusage.    Recitals which are neither repugnant nor contradictory to the body of the indictment, and which do not render unintelligible any of the material traversible matters constituting the charge, may be treated as surplusage.

6. **Same—Certainty.**—Where an offense is charged in the indictment with sufficient legal accuracy to prevent the defendant from being prejudiced in his defense, and as will enable him to plead a conviction or acquittal in bar of a subsequent prosecution for the same offense, the indictment will be sufficiently certain.    Tautology, repetition, bad spelling, incorrect grammar, or want of rhetorical exactness and finish, will not vitiate an indictment unless the words are so inartistically arranged as to make the charge uncertain.

7. **Same—Embezzlement.**—In an indictment for the offense of embezzlement, it is essential to allege that the defendant came into the possession of the property, or had the same under his care, by virtue of his office, agency, or employment, as the case may be; but it is not essential that it be further alleged that the property was in his actual possession at the time he converted the same.

8. **Embezzlement—Evidence.**—In order to sustain a prosecution for embezzlement against an agent, four distinct propositions of fact must be established by evidence beyond a reasonable doubt.    1. That the defendant was an agent as alleged, and by the terms of his employment was charged with the duty of receiving the money of his principal.    2. That he did so receive money belonging to his principal.    3. That he received it in the course of his employment.    4. That he embezzled, misapplied, or converted it to his own use.    See the statement of this case for evidence held to sufficiently establish all of said propositions of fact.

9. **Same—Charge of the Court.**—There being no evidence showing or tending to show that the amount of money embezzled by the defendant was less than $20, it was not error to refuse to instruct the jury as to the lower grade of the offense.

APPEAL from the District Court of Bowie.    Tried below before Hon. John L. Sheppard.

The conviction is for embezzlement of money of the value of more than $20, the punishment assessed being confinement in the penitentiary for three years.

The nature of the case renders it necessary to an accurate understanding of its facts that the evidence in full should be set forth, except the statement of account rendered by defendant, which is lengthy and which is sufficiently explained by other evidence in the case, and is therefore omitted. Said account shows the amount of debits against Mrs. A. E. Sanders to be $4040.89, and the amount of credits in favor of defendant $4814.03, leaving a balance in his favor of $773.14.

Mrs. A. E. Sanders, witness for the State, sworn: My name is Annie E. Sanders. I have been married, but am now a widow. I live in Texarkana, Texas; have been living there for about six months just preceding this time; lived there for eight months prior to my last residence there. Before coming to Texarkana to live I resided at Monroe, La., where I was raised. My husband's name was Sidney W. Sanders. He is dead; he died at Monroe, La., February 1, 1889. Before his death my husband purchased thirteen dwelling houses and lots in Texarkana, Texas. My maiden name was Annie E. Livingston. I know the defendant, O. P. Taylor. I met him first in Texarkana, Texas, in August, 1888. My husband, S. W. Sanders, was with me when I first met defendant. Soon after that meeting defendant came to Monroe to visit my husband, and I saw him then. The next time I saw him was immediately after my husband's death, at Monroe, La. He came to see me immediately after my husband's death (as he said) to sympathize with me and to express sorrow for my bereavement. He professed great friendship for my husband. He came unsolicited by me. Defendant, as agent for the owners, sold the Texarkana property before mentioned to my husband. My husband then placed the property in defendant's charge, as his agent, and he collected the rents up to the time of my husband's death. The first time defendant came to Monroe after my husband's death we had no business transaction. He came again about a month afterward and told me that before he could act as my agent at Texarkana it would be necessary for him to have a power of attorney from me. I then executed and gave him a power of attorney. After he went back to Texarkana he telegraphed me to come to Texarkana. I went there, and he told me the power of attorney I had given him was not sufficient, and I signed a second power of attorney, which he had prepared. [Witness is shown power of attorney dated March, 1889.] She continued: This is the instrument I executed at Texarkana. It is signed by me in the name of "A. E. Livingston." I so signed it at the direction of defendant, who said that as the land had been deeded to me as "A. E. Livingston," the power of attorney should be so signed to enable him to collect the rents. I did not read the power of attorney before or after signing it. This Texarkana prop-

erty was conveyed to me by my husband in August, 1888. After giving defendant the power of attorney I had no business transaction with him. He acted as my agent, and I placed implicit confidence in him. Whenever he presented papers to me to sign, I signed them without reading them or asking questions about them. I am acquainted with defendant's handwriting. [Witness examines two promissory notes.] These notes are in the handwriting of defendant. They are signed "A. E. Livingston, by O. P. Taylor, attorney in fact." One is for $675.75; the other is for $687. The first is indorsed by C. A. Williams; the other is payable to B. T. Estes. I never saw either of these notes until after defendant ceased to be my agent, and had no knowledge of their existence until I was called on to pay them. These two notes are dated, respectively, July 5, 1889, and July 22, 1889. I have paid them off in full and they are now mine. I never received any part of the money for which these notes were discounted, nor anything else for them. [Witness is shown another note.] This is a note for $1050, dated May 8, 1889, due twelve months after date, payable to the order of S. D. Leary. It is signed "A. E. Livingston, by O. P. Taylor, attorney in fact." This note is indorsed by S. D. Leary. It was renewed August 17, 1890, by me. [This last note is shown witness.] This is the renewed note; it is for $1050, dated July 17, 1890, is made payable to my order, and is signed Annie E. Sanders. I signed this renewed note myself. It is indorsed "S. D. Leary" and by "W. C. Hardin." I have paid off this note in full. I received no part of the proceeds of the note executed May 8, 1889, and did not know of its existence until Mr. Leary asked me about it some time in the year 1890. Mr. D. T. Leary called on me to pay the note, and I renewed it, as above stated. I paid Mr. D. T. Leary $105 as attorney's fees charged me for presenting the note. Mr. D. T. Leary proposed at the time he presented the note to me to buy the property mortgaged to secure it at the price of $1500. I did not sell to him. I afterward sold the property to Mr. W. C. Hardin. [Witness is shown two notes.] These notes both bear the signature "A. E. Livingston," and were signed by me. They are both given for $1650 as the principal; one is a renewal of the other. The first one bears date October 9, 1889, the other July 14, 1890. The first one is indorsed by "Dan T. Leary," the last one by "W. C. Hardin" and "Dan T. Leary." I signed the first note and gave it to defendant at his request. I got no part of the proceeds of the note. I have paid off the renewed note, dated July 14, 1890, and it is my property. The several notes which I have been shown were not made for debts owing by me, and I got nothing for them. Defendant was my agent to rent my houses in Texarkana from the date of the execution of the power of attorney, in March, 1889, until about the last of May, 1890, when he ceased to be such. During that time he rented my houses and collected the rents. He had control of and rented for me

thirteen dwelling houses.   He rendered no account of receipts and dis-
bursements during that time.   He never rendered an account until I
forced it from him after he ceased to be my agent.   [Witness is shown
a statement of account between defendant and herself.]   This account
was made out by defendant.   He gave it to J. J. King, who was my
attorney at that time.   Mr. King gave it to me.   I went to defendant
with the account, showed it to him, and he said he had made it out.   I
asked him to go over it with me, and he said to me:   "I will have no
more to do with you; I have an attorney."   This account shows that
defendant collected in rents during his agency $1628.14, and in the ac-
count he gives me credit for $1050 on the S. D. Leary note, $675.75 on
the C. A. Williams note, and $687 on the B. T. Estes note.   These are
all of the credits he gives me.   He gives me no credit for the $1650
note, nor for a note for $1250 discounted by J. Deutschman.   He charges
me with $4814.03, as shown by his account.   Among his charges against
me is "trip to St. Louis, $450."   I never promised or agreed to pay
him to go to St. Louis.   He went of his own account.   When he and I
started to St. Louis from Texarkana I gave him my purse with $100 to
pay my traveling expenses.   We were gone five days, and when we got
back to Texarkana he handed me the purse with no money in it.   He
made no explanation when he gave me the empty purse.   The $100 was
sufficient, and more than enough, to cover all my expenses on the trip.
His account also charges me with "commissions and collections,
$404.37."   He collected no money for me except the rents on the
houses.   His account also charges me with "commissions on disburse-
ments, $162.81," and "commissions on mortgages, $203.13."   He
charges me with more money than I ever received from him.   All the
money I ever received from him would not exceed $500.   I never
agreed or consented to any of said charges or transactions about the
notes.   He did all said acts without my knowledge.   If he discounted
the notes about which I have testified, I knew nothing of the transac-
tions at the time and got none of the money.   At the time he ceased to
be my agent I begged and pleaded with him to do me justice.   He told
me if I did not let him alone he would make me regret the day I was
born.   He pulled his coat open and told me to kill him; that I would
not deprive him of much, as he did not have long to live anyway.   He
threatened to go to Monroe and crush the statue which I had placed
over my husband's grave.   He told me I could send him to the peni-
tentiary, but that I would not be profited by doing so; that he owned
nothing.   Defendant, on being asked by me if he had mortgaged any
of my property, said he had not.   He told me there was a debt against
me of $1600, but that he had reduced that some.   I had heard that he
had mortgaged my property, is why I asked him about it.   I told him
what I had heard, and he told me not to listen to what I heard; that
he would protect my interests.   I did not know of the mortgages on

my property until about the time I discharged him. When he called on me to sign papers I signed them without reading them or making inquiries. I signed all the notes signed by me, and all the mortgages, if I signed any, and all other papers, in defendant's office in Texarkana, Bowie County, Texas. Defendant was living in Texarkana, Bowie County, Texas, during the time he acted as my agent, and was there during the time of the several transactions and conversations about which I have testified. I got no part of any money raised by a note dated March 30, 1889, payable to the order of J. Deutschman, for $1250, and signed by me. If defendant discounted this note, he did not account to me in any way for the money. He gave me no credit for it on his statement. I raised the money to pay off the notes which I have testified to paying by selling the property I owned in Texarkana. I sold it to W. C. Hardin.

Cross-examined by the defense: Mr. S. W. Sanders died in February, 1889; he died from a wound—a shot. [Witness refused to answer how he died. Counsel objected to the question. Objection sustained by the court.] I was married to Mr. Sanders in 1875, in St. Louis. [Refuses to answer whether or not she had made statement that she was married in New Orleans in 1874.] I did not write a letter to Mr. Taylor stating that I was married to Mr. Sanders in New Orleans in 1874 and had lost my marriage license, dated at Monroe. [Counsel for the State objects; sustained by the court; defense takes bill of exceptions.] I do not deny telling Mr. Taylor to pay Mr. Newerth. I told Mr. Taylor to give Mr. Newerth some money and he got it, but he never got $1000. I sent Mr. Newerth to St. Louis in March, 1889, to get a marriage certificate. It never cost but a few dollars to have it recorded. That money was not spent for me. I have met Mr. R. Mollincott. I never authorized Mr. Taylor to pay Mr. Mollincott any money for me. I never met Mr. Mollincott but twice. I was then with Mr. Taylor at the City Hotel in St. Louis. I told Mr. Taylor to pay anything that Mr. Newerth called for. I paid some of Mr. Newerth's debts up there, but what it was for I don't know, through Mr. Mollincott. [Witness shown letter.] This is my handwriting. [Shown letter dated March 20.] This is my writing. [Letter dated May 3.] This is my handwriting. I know John M. Young, of St. Louis; I got acquainted with him in St. Louis. I directed Mr. Taylor to send him $50. I wanted him to have a present from me because he was in poor health and nearly dead with dropsy; he was the justice of the peace that married me in St. Louis. I never told Mr. Taylor that I was never married to Mr. Sanders. I have a suit pending in the Federal Court at Monroe, suing for his estate. He left a very large estate, worth $100,000 or $150,000. The contest is between me and the heirs, brothers and sisters of Sanders. That suit is still pending; it has never been settled. They do not claim that I am not his wife. I signed a

compromise agreeing to relinquish my interest if they would put up $10,000 for a monument to be erected over him. When they got everything, they would not put one cent for the monument. I erected a monument that cost $7900; finished it last year. I did write letters to Mr. Taylor requesting him to bring me money to hurry on that work; told him to sell my property or mortgage it or anything else. I did not urge him to raise money for the man that was hunting up the marriage certificate. He did not pay this man a dollar at my request. I am at the first of it. I did not get Mr. Taylor to go to St. Louis with me. I did not write him a letter urging and requesting him to go with me. I was in so much trouble that I don't remember what I wrote at those times. They were Mr. Newerth's debts. I told Mr. Taylor to pay Mr. Newerth's debts. I admit I wrote that letter dated May 3. I acknowledge that debt. I told him to pay whatever Newerth called for. I sent Mr. Ed. Newerth to St. Louis. Mr. Newerth lived in Monroe, La., and was my friend. I told Mr. Taylor to pay all the money Ed. Newerth called for. Newerth was in St. Louis about three weeks. I think he brought back a marriage certificate. John M. Young was afraid I would do him an injury because he had not attended to his duty in his office; he had failed in keeping a memorandum of my marriage. He said he was not required to do it at that time; that they were not as strict as they are now. Newerth went there for me, and he was not going to suffer through me. I know defendant did not use any $4000 and the rents for two years to pay those men—Mollincott, Newerth, and Young. When Mr. Taylor went with me to St. Louis I gave him my purse with $100 in it. He did not spend five cents for me but my board bill. I was in trouble those days and do not know what I done. [Shown letter dated July 9.] This is my letter. My attorneys in this lawsuit at Monroe are the two Boatner brothers. Mr. Boatner is a gentleman. I did not write Mr. Taylor a letter that I did not want Mr. Boatner to know what was going on about this marriage certificate. Mr. Boatner went to St. Louis and saw it. When he came back he did not abandon the idea of the marriage. I moved to Texarkana in January, 1890. I came there in August, 1889, for a couple of months, but did not move there. I staid there two months at that time, then went back to Monroe. When I left there I staid there very nearly three months, then came back to Texarkana in January, 1890. I then lived at Texarkana about eight or ten months; then I went back to Monroe. I came back from Monroe the first day of February of this year. I went to Monroe last year on the 29th day of December. I am now living in Texarkana, Texas, on Maple street. I live alone. I know W. C. Hardin; he boards at my house. I first saw Mr. Hardin in Marshall, a few months after Mr. Sanders' death. He came to Texarkana in February, 1890. He has boarded in Texarkana, at my house, since then. I employed counsel in this case. Mr.

Hardin employed them at my request. I am now living in one of my houses in Texarkana. Mr. Hardin boards with me. I sold Mr. Hardin my property; he has a deed to every piece of property I have. It is not Mr. Hardin's house I am living in. I had over $12,000 worth of property in Texarkana. The property was deeded to me in the name of A. E. Livingston. I do not know who wrote the deed to A. E. Livingston from Mr. Sanders. It was deeded to me in August, 1888. My husband bought it and deeded it to me. He bought $12,700 of residence property in Texarkana. Mr. Taylor ought to know my state of feelings toward him. My friends in Monroe kept pleading with me to have Mr. Taylor give me back the power of attorney. I asked him for it, and he said he was only using it to collect rents. Mr. Hardin did not tell me these things. I did not have reference to Mr. Hardin when I wrote that letter to Mr. Taylor telling him that his life would be taken by a certain man if he did not settle with me fairly. I said the man was not living in Texas. I remember the letter. He said he was going to show it in court if I brought him there. I do not know when I wrote that letter—some time last summer; did not say anything about killing. Mr. Hardin has not been managing my business; he is managing his own; I have got no business now. He managed it prior to the time I sold it to him. Mr. Hardin has nothing to do with this business. Mr. Hardin is not wearing my husband's diamonds; he did not wear them prior. [Here counsel for the State objects; objections sustained by the court.] I never authorized Mr. Taylor to pay Emma Clifton any money. I had an interview in Mr. Taylor's office with her. I saw her three times in my life and every time she warned me of him. The interviews were brought about by defendant. I don't suppose the judge of the Federal Court at Monroe knows Emma Clifton. [Shown letters dated May 3, July 9, and November 20.] These are my handwriting. O. P. Taylor sent me money to Monroe, La., in 1889 and 1890; sent about $200. [Shown draft dated July, 1889.] I got $120 one time and $80 another time. [Shown draft dated July 6, 1889, New York exchange.] All I ever got from Mr. Taylor would not exceed $500 in everything. I do not remember signing notes for $1250 dated on March 30, 1889, and payable to order of J. Deutschman. Do not remember giving mortgage to Mr. Deutschman to secure this note. I came to Texarkana, and anything Mr. Taylor told me to do I did. He told me not to bother about anything myself, to leave it to him. [Shown check for $100.] I never got that. O. P. Taylor paid me five and ten dollars at a time, and seldom that. He never demanded a receipt from me when he paid me money. When he first came to see me, after my husband's death, he brought $70 and told me to call on him for anything I wanted. I did get $70 on March 8, 1889. I did not authorize him to employ an attorney to go to Monroe, La., to investigate this lawsuit. All I know is that Mr. Talbot took dinner

at my house.   Mr. Taylor told me my attorneys were not to be trusted, and he brought him at his own will.   Mr. Talbot talked to me about the lawsuit just as others did; that I was being mistreated.   I told you I acknowledged Newerth's debts.   I know what Newerth got.   If Mollincott got money Mr. Newerth was the cause of it.   He paid that to Mr. Mollincott and the poor old judge that was dying with dropsy. He died since.   I saw Mr. Mollincott when I was in St. Louis with Mr. Taylor.   Mr. R. Mollincott is a gentleman.   I do not know that he had anything to do with getting the marriage certificate.   Mr. Taylor paid a bill to Mrs. Levy, that I owed, of $142, about July 20 or 25.   He did not pay me $100.   I received three drafts at Monroe from him, exchange on New York.   He paid my bills; guess you can take his word for it.   I got those things from Mrs. Leitner.   He paid three months' rent to Mr. Talbot.   I was at the Cosmopolitan Hotel in August, 1889. Mr. Taylor paid my hotel bill there.   He paid $13 to Hoffman for a cook stove; that is what he told me when I first got it.   I don't know anything about repairs, cleaning wells and such things.   Most of the property was in bad repair when Mr. Sanders bought it.   I don't know what he paid Applebaum for lost deeds.   He got back money for the lounge that he paid for.   He did not pay me on September 10 in cash $110.   He paid for whitewashing.   The lady that lived with me was a sister to Ed. Newerth.   Mr. Taylor paid Dr. Hammond a dentist bill of $14.   I guess he gave me $5 on October 8.   I do not know anything about interest paid on notes.   He gave me $50 in October, 1889.   I know Mr. Leary got $105 for coming and telling me that the note was due.   I did not get mattress February 1, 1890.   Got bill at O'Dwyer & Ahern's, $31:05.   February 10 I got $10.   He paid one rent note to Mrs. Levy.   He did not pay Mrs. Levy two rent notes.   I know I was sued on rent notes.   She did not charge me for the month of February. He did not pay rent notes for February and March.   I don't know anything about $13.75 on April 2.   I don't know anything about interest on notes.   He did not pay Woodfin Furniture Co. $49.50.   [Shown note for $2000, date July 13, 1889.]   This is my signature.   [Witness reads note which was offered in evidence by defendant.]

"$2000.                    "TEXARKANA, TEXAS, July 13, 1889.
    "On December 1, 1889, I promise to pay to the order of O. P. Taylor, at the Inter-State National Bank of Texarkana, Texas, the sum of $2000, for value received, negotiable and payable without defalcation or discount, with interest at the rate of 8 per cent per annum from maturity until paid, and 10 per cent attorney fees if sued upon or placed in the hands of an attorney for collection.      "A. E. LIVINGSTON."

    I do not remember the date when I started to St. Louis.   I do not know what the consideration of this note is.   I do not know where I was at the time I signed this note.   I did not tell Mr. Taylor I would pay

him $2000 for assisting and working for me in this case at Monroe. All I expected to get out of the suit was to pay for the monumental work. He did not tell me that he did not want to go to St. Louis with me. I did not agree to give him this note for his services; I never read it— did not know what it was for. I have never paid this note; never will if I know myself. I have got my home in Texarkana; I bought that in January of this year, 1891. All the other property belongs to Mr. Hardin. I have two boarders now, Russell Hardin and W. C. Hardin. Do not know how far it is from the Benefield Hotel to my house. Russell Hardin pays his own board. Russell Hardin has been in Texarkana nearly ever since his brother has.

Re-direct for the State: Mr. Taylor never called on me to pay the $2000. I did not know he had that note. I do not know anything about those other notes that I paid off. Mr. Taylor was my agent at the time these notes were made. I signed whatever papers he asked me to sign. W. C. Hardin owns this property. I sold it to him because the mortgages fell due and I had no money to pay them off. I sold the property to W. C. Hardin for money to pay off the notes. Mr. Dan Leary offered me $350 for $2700 worth of property. Mr. Hardin bought the property and paid off the notes. I never employed Mr. Taylor to do any service. He suggested the idea of engraving the marriage certificate in the palm of the hand of the statue over my husband's grave, which I did. I did not authorize him to employ Mr. Talbot. Mr. Taylor and Mr. Talbot came in the morning and left in the evening. They took dinner at my house, and talked incidentally about the lawsuit. They did not tell me that Mr. Talbot had been paid. I did not call on Mr. Taylor to take this trip to St. Louis. He had sent me $100 a few days before. My understanding is that Mr. Newerth got about $700. That account has not got the $1650 note on it, nor the $2000 note. The first I knew of that $2000 note is right now. I signed the note without knowing what it was. I owe nothing on it, and never received any consideration for it. He told me he was not charging me anything for collecting my rents. I never got a dollar for those notes that I paid off. My brother-in-law told me the property was mortgaged for $2000. Mr. Taylor told me my property was not mortgaged. He afterward acknowledged that it was mortgaged for $1650. He said he had been paying taxes, and that is all he would tell me. In a few days afterward the tax collector came to me and told me the taxes were due. He said Mr. Taylor had not paid my taxes. That $70 he paid me was the second day after my husband's death. I had seen Mr. Taylor two or three times. My husband was with me the time I got acquainted with Mr. Taylor. He came over on a visit to my husband, and then he came over the next day after my husband's death.

For defense: I did not keep any books between me and Mr. Taylor. All I know about it is what I remember.

For the State:   Mr. Taylor never asked me for a receipt when he paid me money.

Mr. Deutschman, for the State:   [Shown note for $1250, dated March 30, 1889.]   This note was made payable to me, $1250, and $76 interest. All I remember, there was a mortgage drawn up by Mr. Taylor.   He wanted to sign it as attorney, and I told him I would rather the principal herself would sign it.   A. E. Livingston signed it in person; also signed the mortgage in person to secure it.   I gave Mr. Taylor the $1250. Mr. Taylor must have paid it.   I remember his paying it.   He paid it in October, 1889.   He recorded the mortgage and got the money.   Mr. Taylor proposed to make a note as attorney in fact.   I gave Taylor the money on the $1250 note—gave him $1250.

Cross-examined by defense:   I refused to loan the money unless A. E. Livingston in person would sign the note and mortgage.   She signed the note and deed of trust.   I paid $1250 to Mr. Taylor.   He paid the money back.   I suppose Mr. Taylor paid me $50 to secure the loan. [Shown check for $50.]   Believe he gave this to secure the loan.

For the State:   Mr. Taylor gave me $50 if I would make the loan.

Homer Vaughan, for the State:   I am assistant cashier in the Inter-State National Bank of Texarkana.   I have the books showing transactions on 9th of October, 1889.   [Turns to date.]   I find entry on the discount ledger where A. E. Livingston made note of $1650, indorsed by D. T. Leary.   I don't know who presented that note.   Mr. Carman was cashier at that time.   On the 9th of October there is nothing placed to Mr. Taylor's credit.   There is a $50 item on October 12; on the 14th, $4.34.   I never knew of A. E. Livingston having credit in the bank. Do not know anything about the $1650 being paid off.

Cross-examined:   There was a note discounted of A. E. Livingston's, indorsed by D. T. Leary.   D. T. Leary got credit for $1598.85; $1650, less discount, left $1598.85, which was placed to the credit of D. T. Leary.   That was on the 9th of October.   Deposit slip shows that it was to his credit.   The bank books show that this money was drawn out the same day on two checks drawn by D. T. Leary, one payable to W. D. Kelsey for $1329, the other payable to Livingston for $269.

R. C. Carman, for the State:   I was cashier of the Inter-State National Bank, Texarkana, Texas, on October 9, 1889.   Was cashier up to April 1890.   That is a note I discounted.   [Witness refers to $1650 note, dated October 9, 1889.]   I could not tell who brought it to the bank; don't remember who was there.   One reason I remember discounting it is by pencil memorandum on the margin of the note.   [Shown deposit slips.] I could not tell whether it was the identical note; it seems to be.   The money was placed to the credit of D. T. Leary.   Mrs. Livingston, or Mrs. Sanders, never had an account in the bank that I remember of. Don't remember her cashing the note there.   Do not know that I ever saw Mrs. Livingston.   I know the $1650 note was placed to the credit

of Mr. Leary. It was not placed to the credit of Mrs. Livingston or Mrs. Sanders.

Cross-examined by defense: The bank books show on the 9th of October, 1889, a note signed A. E. Livingston, and indorsed by D. T. Leary. After deducting interest of $75 or something, the balance was placed to the credit of D. T. Leary. O. P. Taylor had no right to check it out.

By the State: On 9th of October find check signed by D. T. Leary, made payable to Livingston, for $269; on 10th of October another check signed by D. T. Leary, made payable to W. A. Kelsey, $1329.

S. D. Leary, for the State: I live at Texarkana; have been living there for some time. [Shown two notes, one being the note for $1050.] I indorsed these two notes; I discounted one of them; the other is the same note renewed. I believe Dan. T. Leary asked me to indorse it. They are signed A. E. Livingston, by O. P. Taylor, attorney in fact. I don't think I had any conversation with O. P. Taylor at that time. He was getting this money for Mrs. Sanders. I do not know whether Mrs. Sanders and Mrs. Livingston were the same person. The first note is signed by O. P. Taylor, attorney in fact. Hardin paid off the last note. Mr. Taylor said he got the money for Mrs. Sanders or Mrs. Livingston.

Henry Offenhauser, for the State: I am employed as bookkeeper in the Texarkana National Bank. Have been there since September, 1887. [Shown note, being note for $675.75.] I have seen this note before. It is signed A. E. Livingston, by O. P. Taylor, attorney in fact. This was discounted by the Texarkana National Bank. C. A. Williams discounted it. It was placed to A. E. Livingston's credit by O. P. Taylor. Mr. Taylor checked the money out. Mr. Taylor discounted another note of $687. A. E. Livingston never checked any of it out. The first note, $675, was checked out at different times; the other note was checked out the same day it was discounted. The note dated July 22, 1889, being for $687, was placed to Mr. Taylor's individual credit. The last note was all checked out at one time by defendant.

W. C. Hardin, for the State: My name is W. C. Hardin. I live in Texarkana; have been living there about a year. I know Mrs. A. E. Sanders. Have had business transactions with her. Have paid off notes for her. I paid off some notes that her property was mortgaged for. [Shown note.] This is a note I had taken up and renewed. I paid off that note. I bought all her property from her. I paid her so much money and assumed these mortgages in part payment for the property. When I bought the property I bought it with the understanding that I was to pay off these notes. I have paid it off—paid it with my money. I gave her so much money in cash, think somewhere in the neighborhood of $3000 in cash, and assumed the mortgages. I paid off one note for $1650, and one for $1050. I paid them out of the proceeds of her prop-

erty. [Shown another note.] I paid that off, $675.75, and $3.01 protest fees. Found note for $687. Think I paid that off. It was signed by O. P. Taylor, attorney in fact.. I paid off four notes amounting to $4200. [Shown account.] I have seen this account before. I talked to Mr. Taylor about a settlement on the statement. He said it was a correct statement of his transactions with Mrs. Sanders. He said that was a true statement, and if he had it to make out again he could bring her in debt. He did not say anything about a $2000 note he had against her. She is not credited in this statement with $1650, nor $1250. Leary and Taylor both said the note for $1650 was a personal debt of Mrs. Sanders, for which Taylor was not liable. Taylor said nothing about a $2000 note. He said this was a correct statement for rents and proceeds of notes, and that his charges were correctly entered. I asked Leary about the $1650 note, and he said it was a personal debt of Mrs. Sanders that Taylor had nothing to do with. That was during the last term of the District Court before this. Mrs. Sanders sold me her property, and I paid off the notes and mortgages, and I gave her $1500 in presence of Skeen and a notary public. This was aside from mortgages amounting to forty odd hundred dollars. [Defense objects to line of questions; sustained by the court.] I came into Mrs. Sanders' house, and found Mr. Taylor in conversation with Mrs. Sanders. Before I came to the house I saw Mr. Taylor going there. As I passed the window he went up to Mrs. Sanders and pulled his shirt open and said she might kill him; said she could put him in the penitentiary for what he had done. He then saw me, and he said he was excited and did not know what he was talking about. That was along last March, I think, in 1889. I board at Mrs. Sanders' house. I knew her before I came to Texarkana; met her in Marshall, Texas, in the spring of 1889, and traveled with her to Monroe, La. After this I visited her at Monroe before she moved to Texarkana. She employed me to get her property straightened up in some way. She got me to attend to it. Mr. Taylor told her if she would take his advice she would kick me out of the house. John King, attorney for Mrs. Sanders, got this statement and brought it to me.

Cross-examined by defense: I first met Mrs. Sanders in Marshall, Texas, some year and a half ago. I do not know how long Sanders had been dead. I got acquainted with her at Marshall on the train. She got off at Monroe. I went to Monroe to see her about six months after I met her at Marshall. I went once to Monroe to see her. I have been there once or twice since she lived in Texarkana. I went to visit her at Monroe some five or six months after I met her at Marshall. I came to Texarkana about the 18th of February, 1890. Have been living in Texarkana most of the time since then, might say all the time. Have not been living at Monroe. I think I staid eight or ten days when I went to see Mrs. Sanders the first time. She left Texarkana five or six

times.   I visited her at Monroe while she was there.   I did not mortgage property at the Gate City National Bank to get money to meet notes.   I got Judge Byrne to indorse for me at the Gate City National Bank.   I do not know that Judge Byrne is vice-president of that bank. I did not give Judge Byrne a mortgage on all of the property I bought from Mrs. Sanders to indemnify him.   I think I have had some ten or fifteen thousand dollars in money since I have been here.   Did not run a cigar stand at the Benefield Hotel.   I have been in the real estate business.   Have been selling and discounting sixty day paper, and bought county scrip.   I have boarded with Mrs. Sanders nearly all the time since I have been here.   My transactions have footed up in money over $6000.   I borrowed $4200 from the Gate City National Bank, with Judge Byrne as indorser, to pay off the mortgages on the property I bought from Mrs. Sanders.   I gave Judge Byrne a deed of trust on part of this property I bought of Mrs. Sanders to indemnify him.   I found note at the Inter-State National Bank for $1650, and I asked Taylor why he did not put it on the statement, and he said it was a personal debt of Mrs. Sanders that he had nothing to do with.   I did not tell D. T. Leary that the $1650 note was all right.   Judge Byrne, because I was a customer and had money in the bank, let me have the money.   Could not say when the business relations between Mr. Taylor and Mrs. Sanders ceased.   I came to Texarkana in February, 1890.   This has been my home ever since.   My father is in Texarkana; he came here some time before Christmas.   He is living in Texarkana, and has his family there. I am not a married man.   I board at Mrs. Sanders'.   Mrs. Sanders selected counsel in this suit.   She told me what to do, and I carried it out. I did not employ lawyers out of my own pocket to prosecute O. P. Taylor.   Mrs. Sanders gave me the money and told me to employ lawyers; that Mr. Talbot, district attorney, was disqualified.   The contract was made through me.   Mrs. Sanders sent for me at the store and I came over to see about it.   I employed the lawyers by her suggestion.

By the State:   Mr. Taylor was indicted the last term of the grand jury.   I can't say when he employed Mr. Talbot.

Mr. W. A. Kelsey, for the State:   I know Joseph Deutschman.   I was cashier of the First National Bank last year and year before.   On March 30, 1889, I was cashier.   I do not remember how that note to Deutschman for $1250 was paid off.   I remember having satisfied the records as to the lien and mortgage at the request of Mr. Leary.   Mr. Leary had nothing to do with the note on the face of it.   I met him in the District Court room, and he requested me to satisfy the records.   I know it is paid off.   I do not remember about getting the money.   I seldom ever handled collections.

Cross-examined by defense:   I have been cashier of a bank for about ten or eleven years.   I understand bookkeeping and understand how

accounts should be kept.   It is customary in making out accounts to
keep accounts and notes separate.   It is not customary to put in notes
to show how accounts stand.   If I had been stating the account between
Taylor and Sanders I would not have put the note for $2000 on it.

John Sabine, for the State:   I rented a house from O. P. Taylor, as
agent of Mrs. Sanders, in Texarkana, about two years ago.   I am in the
house yet.   I paid $10 per month rent for it.   I was living in the house
when Mr. Sanders bought the property.   Rented then from Kelley &
Bramble, I think.   The connection with Taylor as agent began in April
or May a year ago.   Can not remember just when I rented it from Mr.
Taylor.   I owed Taylor $30, but $20 was to come off for water works
and repairs.   I paid the rents to Taylor.

Cross-examined by defense:   The statement that Mr. Hardin showed
me was correct.   The house was papered by Taylor while he was agent.
I think there was a little well that a negro came and cleaned out, and
steps were placed at back of the porch.   The property was in bad repair
when Sanders bought it, and is in pretty bad fix yet.

D. T. Leary, for the State:   Mrs. Sanders owed me no money.   That
$1650 note, dated October 9, 1889, was made for the purpose of being
discounted in the bank.   It was discounted for $1598 net proceeds.   I
checked that money out.   The books that I checked out, $1329 to W.
A. Kelsey, and $269 checked out to Livingston, making $1598 amount
deposited.   I do not remember of ever giving Mrs. Livingston a check.
Can not say who I gave the check to.   The $1329 went to pay off the
Deutschman note for $1250, dated March 30, 1889, and signed by A. E.
Livingston.   Can not say who I gave the check for $269 to.   My impres-
sion is that I made it payable to Mrs. Livingston's order.   I don't re-
member of giving Mrs. Livingston a check.   Don't remember of giving
any to O. P. Taylor, but have an impression that I did give the $269 to
O. P. Taylor.

Mrs. Sanders, recalled for the State:   I don't remember who gave
me the $1650 note dated October 9, 1889.   Think it was defendant.   Mr.
D. T. Leary never gave me a check on the Inter-State National Bank for
any money.   I know Mr. Leary.   He never gave me a check for $269
or any other amount.   I never heard of the Inter-State Bank paying
check in my name.   I never read the power of attorney.   It was sev-
eral months after defendant gave me statements that I found out that
the property had been mortgaged.   He denied having mortgaged the
property.   I asked him what he had got the money for, and he told me
to leave that to him and he would bring it all right, and for me not to
believe anything that was told to me, for it was not true.   Up to the
time of my husband's death Mr. Taylor made monthly statements of
rent collections.   After his death he made no statements.   When he
gave me money he would take no receipt for it.   I did not know how

much he charged me in this account.  He told me he was not charging anything for collecting rents.

.By the defense:  I went to look at a pistol and Mr. Taylor sent me one by express, to Monroe, for a present.  I did not contract to buy the pistol, and if I had wanted it so bad I would have taken it again.  I do not know what time the pistol was expressed to me at Monroe.  [Objection to question of how Sanders met his death; overruled by the court.]  Mr. Sanders came to his death by his own hand with me in his arms.  He did not shoot at me twice.  He shot at me once before he killed himself.  He thought I was dying, and he did not want to stay in the world without me.  I was accused by Mr. Sanders' relatives that it was not suicide, but murder. .

For the State:  Mr. Sanders was a Democrat was how his trouble came.  He had trouble with people in the town, and was accused of burning his own house to get the insurance.  He was accused of arson and prosecuted by his enemies, but the grand jury did not find any true bill against him.  He came home and found me with a chill.  He took his own life, but lived twenty-four hours after he was wounded. Was conscious, but could not speak.  After he shot I jerked away from him and went out and gave the alarm.  A doctor who was living near and my brother came, and they were the first that got into the house. The physician staid until he died.  They examined the wound and found it was as I said.  As the people had treated them so wrongly I felt it was my duty to show them that I had respect for him, and it was for that reason I had the monument erected.  I had him removed to my home and kept him there nearly three months, until the vault was finished.

For the State:  I do not know how long it was after my husband's death when Mr. Taylor sent me the pistol.

The State introduced as evidence the following notes:

"$675.75.                    "TEXARKANA, TEXAS, July 5, 1889. ·

"Twelve months after date I promise to pay to the order of Texarkana National Bank $675, at the Texarkana National Bank, Texarkana, Texas, for value received, with interest at the rate of 12 per cent per annum after maturity until paid.  And in case of legal proceedings on this note, I agree to pay 10 per cent on the amount for attorney fees.                         "A. E. LIVINGSTON.

"By O. P. Taylor, attorney in fact.

[Indorsed]     "C. A. WILLIAMS."

Also the following:

"$687.                      "TEXARKANA, TEXAS, July 22, 1889.

. "Twelve months after date I promise to pay to the order of Texarkana National Bank $687, at the Texarkana National Bank, Texarkana, Texas, for value received, with interest at the rate of 12 per cent

per annum after maturity until paid.    And in case of legal proceedings on this note I agree to pay 10 per cent on the amount as attorney fees.                              "A. E. LIVINGSTON.

"By O. P. Taylor, attorney in fact.

[Indorsed]      "B. T. ESTES."

Also the following:

"$1050.                          "TEXARKANA, TEXAS, May 8, 1889.

"Twelve months after date I promise to pay to the order of S. D. Leary, at the Inter-State Bank of Texarkana, Texas, at Texarkana, Texas, the sum of $1050, for value received, with interest at the rate of 12 per cent per annum from date until paid, and 10 per cent attorney fees if sued upon or placed in the hands of an attorney for collection. Interest payable quarterly.              "A. E. LIVINGSTON.

"By O. P. Taylor, attorney in fact.

[Indorsed]      "S. D. LEARY."

Also the following:

"$1650.                          "TEXARKANA, TEXAS, October 9, 1889.

"Ninety days after date I promise to pay to the order of Dan T. Leary, at the Inter-State National Bank of Texarkana, Texas, the sum of $1650, for value received, with interest at the rate of 12 per cent per annum from maturity until paid, and 10 per cent attorney fees if sued upon or placed in the hands of an attorney for collection.

"A. E. LIVINGSTON.

[Indorsed]      "DAN T. LEARY."

The State also introduced the renewed notes for the last two notes, the renewed note for $1050 bearing date July 17, 1890, signed "Annie E. Sanders," indorsed "Annie Sanders, S. D. Leary, W. C. Hardin"; the renewed $1650 note, bearing date July 14, 1890, signed "A. E. Livingston Sanders," indorsed "W. C. Hardin, Dan T. Leary."    The State also introduced the following note:

"$1250.                          "TEXARKANA, TEXAS, March 30, 1889.

"Six months after date I promise to pay to the order of J. Deutschman at the First National Bank of Texarkana, Texas, $1250, for value received, with interest at the rate of 12 per cent per annum from date until paid, and 10 per cent for attorney fees if collected by law or placed for collection.                              "A E. LIVINGSTON."

The State introduced power of attorney as follows:

*The State of Louisiana, Parish of Ouachita.*—Know all men by these presents, that I, A. E. Livingston, a *femme sole* of Ouachita Parish, in the State of Louisiana, have appointed, and by these presents do constitute and appoint, O. P. Taylor, of the City of Texarkana, in Bowie County, Texas, my true and lawful agent and attorney in fact for me, and in my

name, place and stead, to rent or lease all real estate, lands, or town lots belonging to me and situated in the City of Texarkana, in Bowie County, in the State of Texas, with all the appurtenances thereto belonging or in any wise appertaining, at and for such yearly or other rents as he shall think fit. I also hereby authorize and empower said attorney, for me and in my name and stead, to borrow money and to execute a note or notes therefor, with such stipulations therein as to principal, interest, and attorney fees as he may deem proper, and to secure the payment of the sum or sums so borrowed, do authorize and empower him to mortgage said real estate on such terms and conditions as he may deem proper. And I do hereby authorize my said attorney to sell and convey said real estate in fee simple, either for cash or credit, on such terms as he may deem proper; and I do hereby authorize and empower him, said agent, to execute and deliver all such notes, liens, deeds, receipts, releases, and acquittances as he may deem necessary in carrying out the powers herein conferred, and to receive and receipt for all moneys arising and accruing to me under the provisions of this power of attorney, hereby granting to my said attorney full power and authority to do and perform all things in the premises.

The defendant then introduced the following deed: "Executed and delivered by S. W. Sanders. Conveyed the following property to Miss A. E. Livingston: Situated in the State of Texas, County of Bowie, and City of Texarkana, being lots Nos. 1 and 2 in block No. 45, and lots Nos. 10, 11, and 12 in block No. 60, and lots Nos. 11 and 12 in block No. 126, lots Nos. 10 and 11 in block No. 131, and lots Nos. 7, 8, and 9 in block No. 131, and lot No. 1 and north half of lot No. 2 in block No. 113, as laid down on the plat of said city. Deed dated August 31, 1888. Acknowledged same day before O. P. Taylor, notary public of Bowie County, Texas. General warranty deed, filed for record February 6, 1889, and recorded same day in deed records of Bowie County, Texas."

O. P. Taylor, for defense: I am defendant in this case. Judge Vaughan drew up the power of attorney. Mrs. Sanders' purpose in authorizing me to sell and mortgage in Texarkana was to get money for this marriage certificate. She wanted me to pay out money for her in St. Louis, and to pay for the tombstone partially. She wanted to put up a sarcophagus to her husband to prove her marriage to him. The first reason of the power of attorney was to get money for the marriage certificate. She wanted to mortgage her property to get money to pay Newerth for the marriage certificate. Mr. Sanders bought this property from me, in Texarkana, as agent for the owners of the same. He came to my office and said he wanted to buy some property, and I showed it to him. I am a real estate agent in Texarkana. I sell real estate for parties on commission. I attend to and collect rents on commission; attend to business connected with rents, and negotiate loans on real estate. I am a real estate and loan agent. Mr. Sanders bought $12,750

worth of property from me. He gave me a draft to pay for it, and I paid for it. The deeds were made out in the name of S. W. Sanders in the first instance. [Shown two cards.] I suppose this is S. W. Sanders' handwriting. It is signed by him. I got one from Malvern, Ark., and one from Hot Springs, Ark.—one August 19, and the other not dated. I bought that property for Mr. Sanders some time in 1888. That card was written about August 20, 1888. A short time after he bought the property he said he was going to Hot Springs, and would come back. He gave me draft for $12,000, which I paid for the property, and I had the deeds written out when he came back. [Counsel for defense offers two postal cards in evidence, one dated August 19, the other no date, telling Mr. Taylor to make deeds to the property from him to Miss A. E. Livingston.] I wrote the deed. No one was present at the time it was written but Mr. Sanders. The last deed was written in my office, in Texarkana, and acknowledged before me as notary public. [Shown deed.] This is the deed. I saw Mr. Sanders sign it, and this is my acknowledgment as notary public. This is my seal. This is from Sydney W. Sanders to Miss A. E. Livingston. After this property was bought in Texarkana in August, 1888, it was placed in my charge by Sydney W. Sanders, as his agent. He placed it in my charge, and I collected rents and accounted to him for the rents. I was to look after the property and collect rents. When I sold him the property he rode along the street and I pointed out the property to him, and he said he would take it. Never got out of the buggy to look at one single piece. When we got back to the office he said he was going to Hot Springs and would be back in about two weeks, and for me to have the deeds fixed up when he got back. When he got back he signed deeds to Miss Livingston, and gave me draft for $12,700. He then told me to take charge of the property, and he went back to Monroe. He told me to collect rents and account to him for it. [Shown account beginning August 25.] This is my account against Mr. Sanders up to the time of his death, February 1. He killed himself. I had a difference between $516.75 and $202.79, which would be about $313.95, due by me to S. W. Sanders at the time of his death on rents. [State objects to showing transactions with S. W. Sanders.] I did not know until the 3d of February that Mr. Sanders was dead. I gave Mrs. Sanders credit for the whole business. I collected $1628.10 rents on that property from the time I received it, August 25, 1888, to May, 1890, when I ceased to be agent. That is the entire amount of the rent money I received. This account shows each item I collected and from whom I collected it. I gave every man a receipt that I collected rent from. I paid Mrs. Livingston on March 8 $70; paid it into her own hands. Wherever those checks appear on the account I have vouchers to show that I paid it. I have here drayage on lumber, $1. I never took any receipt. I meant it was for lumber delivered at the house that Sanders bought. I had

the houses numbered. I paid the money, because I never put down anything that I did not pay. I went to Monroe on March 6 to get deed that S. W. Sanders had made to Miss Livingston. Went there at her request. Never went there except at her request. I had the deed recorded. It had never been recorded up to that time. There was nothing to show that the property belonged to her. I went to look after the deed for her interest. I thought it was necessary to look after the deed, because Sanders deeded it to her, Miss A. E. Livingston. I thought there must have been something wrong about it, and I went to get the deed and have it recorded. It had never been put on record. I did not know until I went down there that there was any trouble about the Sanders estate. Then she told me the situation. I told her I thought her interest required that the deed be recorded. I paid $1.25 for recording the deed. I paid everything that is set down in this account. On March 24 I charged her for a trip to Monroe because she asked me to go down there for some purpose, don't remember what; her letters will show. I had to wire Newerth sometimes three or four times a day while he was in St. Louis. I paid Newerth on March 30, 1889, $100. I have a voucher for it. I paid attorney fee to J. M. Talbot, $100, and have his receipt. Another trip to Monroe, $30. I went down there at her solicitation for the purpose of taking an attorney down there to see how she stood in this case between her and the heirs of Sanders. It seems she mistrusted her attorneys. She told me to employ Judge McLean. I either spoke to Judge McLean and he would not go, or he was not here. Know I spoke to Judge McLean about the case. I afterward got Talbot to go. She said she wanted me to bring a lawyer, because she could not trust her Louisiana lawyers. I charged her $25 for the trip when I went with Mr. Talbot. I went to see whether there was any necessity to employ lawyers to go into this case. Have no receipt for drayage, etc., but paid it. Have nothing charged on this book that I did not pay. I paid $5 for lost deeds to Applebaum. There were two lots to which the deeds were lost, and I wanted to get up all the old deeds I could after the fire which destroyed the court house and records of Bowie County, on January 21, 1889. Found that Applebaum had those deeds, and he said he would not give them for less than $5. I paid draft drawn on me by R. Mollincott, of St. Louis, for $250; paid it by check on Inter-State National Bank. I never took a receipt from Mrs. Sanders when I paid her money. Never took receipt from any man when I paid him money for rents. When Mrs. Sanders left she sold furniture to a negro that worked for Mullins. The negro gave notes. She told me to collect the notes when due. I collected $27.50. From the time I took charge, in August, 1888, to May, 1890, I collected on rents $1628.10. Have paid out for Mrs. Sanders during that time $3984.17, as shown by this account. In addition to this I have paid out $315.15 which does not appear on this account, and for which I have

vouchers, and forgot from some reason to charge. I executed note indorsed by S. D. Leary for $1050, and gave Mr. Leary mortgage on Mrs. Sanders' property to indemnify him. The $1050 was placed to my credit, less discount. That was May 8, 1889. On July 5, 1889, I executed note for $675.75, with C. A. Williams as indorser. I gave C. A. Williams a mortgage on Mrs. Sanders' property, as her agent, to indemnify him, and received that money less interest. On July 22, 1889, I executed note for $687, B. T. Estes as indorser. I received that money as her agent. In the Deutschman loan, March 30, 1889, Mrs. Sanders signed the notes and mortgage in person for. $1250. I got that $1250 as her agent. I got the money on the Deutschman note and the other three notes. I borrowed the money at Mrs. Sanders' solicitation. She wanted to get this marriage certificate in St. Louis, and to pay this man Newerth and to pay for the tombstone. The first $1250 was to be used for paying for the marriage certificate, and the other for the tombstone. When a man puts property in my hands I charge 10 per cent for collections and 10 per cent for disbursements and repairs. I charge 10 per cent either way. I collected on rents for Mrs. Sanders $1628.10; I am entitled to 10 per cent on that amount. When I rent property I find tenants, make the contracts, and look after the collection of rents, repairing, insurance, etc. For collecting rents 10 per cent, and for looking after repairing, insurance, taxes, etc., is 10 per cent. It is worth as much to see about repairing, insurance, taxes, etc., as it is to collect rents. I never agreed to attend to Mrs. Sanders' property for nothing. I charged her just the same as I would anybody else. My charges for securing loans are 5 per cent. I was entitled to 5 per cent of the money borrowed on that property for securing and negotiating loans. I always charge 5 per cent unless I make a special bargain. For the Jarvis-Conklin Mortgage Trust Company I had special contract for 3 per cent. That $2000 note, Mrs. Sanders gave me that on the 13th day of July, the day I started to St. Louis with her. I told her I could not waste my time in helping her to work for $100,000 or $150,-000; that I had to use my time and a good deal of my means. She agreed to give me that note in consideration of my services for helping her get through. I expected to have to go to Monroe to the Federal Court to testify in her case, and do whatever she required me to do. She had a lawsuit in the Federal Court in Monroe, suing for the Sanders estate, worth from $100,000 to $150,000. I was to assist her in that lawsuit and help her to get her rights in the case. I told her I could not afford to do it; that I did not feel like I was doing myself justice without getting good pay for it. She was under a cloud in Texarkana, and I was necessarily under the same cloud. She moved to Texarkana because she could not get her suit in the Federal Court in Monroe as long as she was a resident of Louisiana. She told me she wanted me to go with her to St. Louis to see if the marriage certificate

was all right and see if it was on record, and so that I could see Mol-lincott and Young and be able to testify that the certificate was all right. I went with her at her request. I suppose that the trip cost me about $200 that I paid out. I paid every dollar of that trip. I had $100 when I started, and drew two checks, one for $25 and one for $50, and then had to telegraph to Texarkana for $25 more. While in St. Louis I paid some bills for her at Scruggs, Vandervoort & Barney's, and paid about $25 to a fortune teller for her. My actual expenses were about $200. I telegraphed to my son for $25 and he sent it to me by telegraph, and I drew $50 from one bank and $25 from another, besides the $100 I had when I started. She did not give me her purse with $100 in it. I charged $450 for that trip. Went on Saturday evening, the 13th of July, and got back on the 18th. At a time like that I would not go away unless a man would pay me for it; would not go away for less than $50 a day. My business at that time paid me about $3000 a year. In July and August my receipts were about $2000 for the two months. In 1888 and 1889 my cash receipts would average from $8 to $10 a day. In 1890 they amounted to a little more. Sometimes make a trade in a day of $500, $300, or $100. Did not like leaving home without remuneration of what I might make in the time I was gone. This was the reason I charged $450. That note for $2000 was drawn up at my office. She knew all about the contract. I told John King, her attorney, about it before and at the time I delivered him the state-ment of account between me and her. Also told him about the $1250 I got from Deutschman. I also told D. T. Leary, my attorney, that I had that note of hers for $2000. I told Mr. King that I was claiming the $2000. John King was representing Mrs. Sanders. I made out this statement and delivered it to John King in order that a settlement might be made between us. Mr. Hardin said yesterday that I had told him that that statement was correct. I never spoke to Mr. Hardin about that statement. I did not recognize him in the settlement at all. I never heard anything of the settlement after I had given the statement until I was indicted. I made out the statement and delivered it to John King in May, 1889. I have got property liable to execution, about four or five thousand dollars' worth, consisting of real estate, city lots in Texarkana, and three or four hundred acres of land in Liberty County, Texas, besides my homestead. I would say $4000 worth of real estate. Mrs. Sanders owes me fifteen or eighteen hundred dollars on statement. I was in a hurry when making out the statement. I am entitled to all the credits that I put on that account. I only charged her on the books for one fifty-dollar rent note paid to Mrs. Levy, when I paid two for $50 each, and am entitled to a credit of $50, which does not appear on the statement rendered. On March 30, 1889, I paid her $100 that I have not charged in book. Have a bank check for it, here it is, drawn on the Inter-State Bank. The bank returned that check to me about a

month ago, and I had overlooked it till the check was returned.  The 30th of March, 1889, was the day I borrowed $1250 from Deutschman, and on that day I sent $400 to Newerth in St. Louis, and here is the exchange to show it.  When I drew draft, April 18, on New York, I think, I had to pay $2 exchange.　The interest on the Leary mortgage was paid quarterly.  On May 9 $32.50 is the interest on the Leary note.  That was for $1050, less interest.  Interest was payable quarterly in advance.  It came due August 9 next.  I paid interest for those two quarters and did not charge them on the books, and I am entitled to these two credits of $32.50 each, which were omitted from the statement rendered.  When I first made the mortgage I took the amount, less $32.50, for interest.  In August it was renewed again, and on November 9 I charged the interest, $32.50.  I have not got the Levy rent note charged anywhere else.  I am entitled to $50 on that, and have statement that I paid them through the Inter-State National Bank.  Mrs. Leitner's bill for $15 is not charged on the statement I rendered, yet I paid it and forgot to charge it.  Mrs. Sanders told me she wanted me to get a loan, and unless I paid $50 bonus I could not get it.  Deutschman said the interest on the note would not amount to enough without the $50, and I paid Deutschman $50 to induce him to negotiate the loan of $1250 on March 30, 1889, and it does not appear in the statement rendered, and I am entitled to this additional credit of $50.  I don't know anything about the $1650.  I did not handle a dollar of it.  Mr. Leary and Mrs. Sanders had the business.  After this matter got into the hands of King I never heard anything about it.  Hardin never asked me a word about it.  I never had any conversation with Hardin in regard to this matter.  I had nothing to do with that $1650.  What Mrs. Sanders and Mr. Hardin testified to about me telling her she could kill me, etc., is a lie out of the whole cloth.  I went to Mrs. Sanders and asked her if we would settle this or would it be settled by attorneys.  She said that we would settle it.  Hardin came in when I had got through talking with her, and from the situation of the room he could not have heard a word that was said.  John King said he would not take it up after he had dropped it.  That was after the conversation took place between her and me.  I went back and asked her if she would put it in the hands of the lawyers.  I told her I wanted to settle it amicably.  I told John King everything in the business.  I told him about the two-thousand dollar note.  I told D. T. Leary about it, he being my lawyer.  John King was representing Mrs. Sanders.  I never spoke to Hardin about the statement.  I got those letters that were shown to Mrs. Sanders yesterday out of the postoffice.

Cross-examined by the State:  Captain Vaughan wrote the power of attorney shown in evidence here.  Do not remember who made the first power of attorney out.  I do not know where the first one is; don't remember whether I gave it back to her.  One thing that was wrong about

it, it did not have a seal to it.   The justice of the peace that signed it did not put a seal on it.   She was here in Texarkana when she signed this last power of attorney.   The first power of attorney was not full enough; did not give authority sufficient to borrow money for her.   This one does.   She came up here to sign this one.   I purchased this property from D. T. Leary, Keely & Bramble, W. A. Stacy, Porch, J. P. Bryan, and some other person.   This is the property Sanders bought. Don't suppose I was more than a day and a half in selling the property to Sanders.   I got those postal cards from Mr. Sanders, telling me to deed the property to Miss A. E. Livingston.   I had seen her before that time.   Saw her in company with Mr. Sanders the day he bought the property.   She did not go around to look at the property.   He told me that he was married to Mrs. Sanders.   Said some people doubted it. Said some people at Monroe had been mad at him and accused him of burning his own house, and had gone so far as to say that he had never been married to his wife (pointing back to Mrs. Sanders.)   He said it was not so; that he was married to her privately, and that it was none of their business.   Mrs. Sanders and I had a falling out in May, 1890. About the first of June Mr. Lambkin asked me to make affidavit that Mr. Sanders had said that she was his wife and that Mr. Sanders had said that they had been married secretly.   I made the affidavit as requested. I did not believe that they were married.   [Shown letter.]   I wrote that letter.   When I wrote that letter I did not believe she was married.   I never did believe it.   I do not remember the exact date of Sanders' death; think it was about the first of February.   I heard of it on Sunday and went down there on Monday.   The reason I went down there I thought of this deed.   I knew I had written the deed, and I went down there to see if she knew the deed was in existence.   I thought it was best to go down at once and put the deed on record.   I had no interest in the matter in the world.   I thought she ought to have the property.   I took out letters of administration on the Sanders estate because I was managing his property.   It was suggested to me by my partner in the office, Mr. W. M. Campbell, who is now dead.   He told me I had better take out letters of administration on this property.   I do not know of anything he owed.   I did it merely at Campbell's suggestion. I was not as experienced in business matters as Campbell was.   I knew Sanders had made this deed to her, but did not know what became of it.   I made application for letters of administration on S. W. Sanders' estate on Monday, the same day I started to Monroe.   When I went down there I think I tried to get power of attorney to act for her.   I got first power of attorney and it did not hold good.   I charged $25 for going to Monroe to get the deed.   I went in her interest.   She did not ask me to go; she did not promise to pay me for going; she did not agree to pay me anything.   Mr. Meyers told me where the deed was. She did not know she had any property in Texarkana at that time.   Mr.

Sanders never intimated to me that she knew anything about it.  I
brought the deed back and had it put on record.  Sanders signed the
deed, put it in his pocket, and went back to Monroe.  Mrs. Sanders
executed note to me for $2000.  It was to engage me and my interest,
and for me to use my influence in her suit.  She expected me to be a
witness in this case down at Monroe.  She wanted me to prove in the
first place that Sanders told me he was married to her.  I considered
the odium attached to her in this business, and the work I did for her.
I expected to have to go to Monroe and to do everything I could in her
favor.  I did not propose to do anything whether it was right or wrong,
but I was getting money for her all the time and using my time in her
interest in the matter.  I used all the time she demanded of me.  I was
gone five days to St. Louis.  The $2000 was to cover my employment
in this business.  I was about to start to St. Louis and it was to cover
all my services in the case.  I charged her up with the $450 extra; the
$2000 was for having anything to do with her, and for what I expected
to do for her afterward.  I went to Monroe, La., as soon as Sanders
was dead.  I knew she was living with him as his mistress.  That time
I went there I staid at Monroe just one day.  She told me she was not
married to Sanders.  I wrote letter dated March 18.  [Counsel for the
State reads letter.]  I thought she deserved what she would get if she
made such a sacrifice, and think so yet.  I thought her living with that
man would entitle her to it.  I told her what the $2000 was for.  I told
her the people were talking about my connection with her, and that I
could not afford to do it for less, and if I went there I would charge her
for it.  I charged $162.81 commissions for collecting rents.  I did not
expect to do anything wrong, but wrong would attach to me for doing
things I had done.  I charged her 5 per cent for borrowing money.  I
did not charge her 10 per cent for paying it out to other people.  I
have charged $450 for going to St. Louis.  I was gone five days.  I was
out nearly $200.  She did not give me her pocketbook with any money
in it.  Then I drew two checks, one for $50 and one for $25, then had
to telegraph for $25 more, making $200 I was out.  I went to see Mol-
lincott; he was deputy sheriff.  I went to look him up according to her
instructions.  He went to the court house to show me this marriage cer-
tificate.  She asked me to find her a fortune teller.  She did not tell me
what the fortune teller had told her.  She went out on the street when
I was not with her.  When she came back she said she had seen a for-
tune teller's sign, and she wanted to go and see her.  I did not hunt a
fortune teller up.  She asked me to go with her about it, and I went.
I made interviews between her and Young and Mollincott.  Mollincott
brought Judge Young up to the hotel to meet her.  I saw Judge Young
but had nothing to do with him.  Newerth brought back a copy of the
marriage certificate when he came from St. Louis.  I was subject to her
orders all the time, even going to the fortune teller's.  I always wrote

to her to be careful and not talk to any one. I wanted her to win the suit; it was to my interest to see that she did. I do not remember of writing to her about taking a trip to New Orleans. I do not know anything about the $1650 note, and never saw it until to-day. I did not see her sign it. I do not know where it was signed. I remember only that Kelsey satisfied the record. I am confident that Deutschman note for $1250 was paid out of the $1650. I do not remember when she signed that $1650. I was attending to her business at that time. I do not know anything about it. I never inquired about the Deutschman note. I remember when the satisfaction on the Deutschman note was made. Don't remember when I got it back. I said I got a good many checks and accounts since I made the statement. I found them within the last six weeks. I gave Mrs. Sanders the check, and do not know whether she presented it or got the money from some one else. I believe I have charged all I know of. I think I put down all the money I paid Newerth and the money I paid Mollincott, of St. Louis, and it amounts to $1050, and here is the exchange to show it. I did not give her credit for the $1250 because she told me not to put it in the statement. She said she did not want the people at Monroe to know she had mortgaged it. She knew I had $1250 against her. I acknowledged the $1250. She told me not to put it on the statement. I have given her credit for it. I gave her credit for the $1250 on that statement. I do not deny the $1250. She told me never to put it on the statement. I made out the statement at the request of John J. King. She said she did not want the mortgage to go down. I have not given her credit for it on that statement; did not put it down on the statement, but gave her credit for it. I went and told her I wanted to have a settlement with her. I did not tell her if she went into court I would make her wish she had never been born. I never said anything about blackening her character if she brought me into court. I have no idea as to the difference between the $1650 and the $1250. I was her agent at that time. I think Mr. Leary told me the Deutschman note had been settled. I remember that Mr. Kelsey had told me that he had satisfied the record. It did not excite my curiosity enough to inquire into the business. If she made transactions outside of me I did not have anything to do with it. [Shown mortgage of date October 10, 1889.] This is my signature as notary public. This mortgage was executed to secure $1650 note of date October 9, 1889. I must have known it if she acknowledged it before me. The mortgage is in my handwriting, and this $1650 note is copied in it. I wrote the mortgage. I do not remember anything about it now. Possibly I might have gotten the $269. The check I gave her for $100, don't know whether she ever got the money, but know the check was drawn for her and given to her. I do not remember drawing any checks for her but that one. I generally gave her the money in her hands. I charged her commissions just as you see

on this account. Mrs. Sanders signed the note to Deutschman. I did not sign note as her agent. Did not sign mortgages. I simply rendered money I had as her agent. I had nothing to do with the $1650 mortgage. I took her acknowledgment. I did not handle the money. I never had anything to do with it. The bank book shows that it was put to the credit of D. T. Leary. The $2000 note was given for me to do everything I could to further her interest as long as that litigation was pending. The contract was that I was to help her in every way I could to the end of the suit. She expected the suit to terminate in December. I have never heard that it had been abandoned yet. There is about $100,000 or $150,000 involved in that suit. I have no idea when it will be terminated. I never failed to render any assistance in my power. I always answered when she called for me to do anything. I rendered a statement to Mrs. Sanders while she was in Monroe, prior to the time she came to Texarkana. I left out the $1250 when I rendered this statement. I had Jim Robinson to make out the statement and I carried it to her in Monroe. It was in April or first of May, 1889, when I made the statement showing how we stood up to April 27, 1889.

Examined for defense: I wrote that mortgage to secure the note for $1650. I know this because it is in my handwriting, though I have no recollection of doing it. I write a great many deeds and other instruments and take a great many acknowledgments. When Mrs. Sanders and I were in St. Louis I went to the court house and examined the records. The marriage certificate was recorded but a short time before. I was there in July, 1889, and it was recorded in March or April, 1889. She was trying to get up a fraudulent marriage certificate. I knew it was a fraudulent marriage certificate she was trying to get up. She said she did not want the $1250 borrowed from Deutschman on March 3, 1889, to appear on the books. She did not want the people at Monroe to know that she had mortgaged the property. I did not render the $1250 on the first statement I rendered her in April, 1889. She knew all about it; so did her lawyer, John King, and my lawyer, D. T. Leary. I never denied receiving the $1250 from Deutschman, and always acknowledged my liability for the same. When I rendered the statement to her attorney in May, 1890; I told him and also told Mr. Leary about it. I put in the statement the money I paid Newerth and Mollincott, which was $1050.

Mrs. Levy, examined by defense: I know O. P. Taylor and Mrs. Sanders. About August 12, 1889, he paid me a bill of $142 due me by Mrs. Sanders for furniture which I sold to her. I gave Mr. Taylor a receipt for it. I also rented a house to Mrs. Sanders for $50 per month and took her notes in advance for the rent. Mr. Taylor paid two or three of these notes. I know that he paid the notes due for the rent of February and March, 1889.

Mrs. Leitner, for the defense: I had two bills against Mrs. Sanders, one for $13 for a lounge, and another for $15. Mr. O. P. Taylor paid both of these bills. I am a merchant in Texarkana, and sell furniture.

J. M. Talbot, Esq., for the defense: O. P. Taylor paid me $100 for going to Monroe to see about the Sanders estate. He employed me to represent Mrs. Sanders' interest; that is, he asked me to go down and look into it and give my opinion about Mrs. Sanders' chances to secure the property. I told him I would not go for less than $100. I think I paid my own expenses there. I saw Mrs. Sanders when I went down there. I talked to her about the case. She certainly knew about me coming and what I came for. The case was discussed in her house. The conversation was about her business. She was dissatisfied with her attorneys there, and the matter was talked over at her house. There was some gentleman at her house. Mr. Taylor, this gentleman and myself, after dinner I believe it was, went down to her lawyer's office, and Mr. Stubbs went over with me to investigate the records. It seems a compromise had been entered into, my understanding was, by the lawyers representing the other parties, and Stubbs, that she was to receive $20,000 out of the estate. By the settlement and agreement she was to receive the Texarkana property and her home place there at Monroe. These matters were fully discussed and talked of. I remember discussing the matter with Mrs. Sanders about the settlement that was made. The question arose as to whether she was Sanders' wife. I argued with Mr. Stubbs that if she had lived with him as his wife she was entitled to his property. He said that under the laws of Louisiana she could not hold the property under those circumstances. Mrs. Sanders occupied my house at one time. I do not remember the exact time; perhaps a year ago. She occupied the house several months. Mr. Taylor paid the rent; Mrs. Sanders never paid me a dollar; I think he paid $15 per month.

Mr. Lemly, for the defense: [Shown bill.] Mr. O. P. Taylor paid that bill. He bought the material for Mrs. Sanders. I remember sending bill of paper to Monroe. I think it was about a year ago. I rendered bill for it. It was paid by O. P. Taylor, $13.20, and sent to Mrs. Sanders at Monroe.

Mr. Hoffman, for the defense: I am engaged in the hardware business in Texarkana. I sold a stove to O. P. Taylor. It was put up in a little house next door to a place formerly owned by Mr. Campbell. I did not know that Mrs. Sanders was living there. It was a yellow house on Maple Street. Mr. Taylor paid the bills.

Mr. Taylor, for the defense: Mrs. Sanders was living in that house where Mr. Hoffman put up the stove at that time. It was Jim Talbot's house. I had nothing to do with Emma Clifton coming to my office. She said she knew Mrs. Sanders, and wanted to see her. I asked Mrs. Sanders if she knew Emma Clifton, and she said she had been knowing

her for some time. She asked me to see where she could meet her. Emma Clifton came to my office and told her where to meet her. The first time they met in one of Mrs. Sanders' vacant houses. I saw them kiss each other when they met. I don't know what their conference was about. She told me that Emma Clifton wanted her to go to her house, and she asked me if she had better go. I told her if she went in there I would never have anything to do with her. They met again upstairs over Behan's store. I do not know what business they were on. Emma Clifton told me she could have some influence with Judge Bowman, in Louisiana. I was in favor of Mrs. Sanders' interest.

The following letters were here introduced:

*" Mr. Taylor:*  "MONROE, March 15.

"DEAR, KIND FRIEND—You can't imagine how grateful I feel to know I have one real true friend. I may have to try your patience in my case. His highminded kin say I will have to prove that I am a wife. They say it is for the honor of the name they are trying to save. You know the value of that assertion. I have borne the name a long time for them just now to become so interested in its behalf. O, my friend, I am in so much trouble. I would be a thousand times better dead. I hate to think of it, but I am afraid that it is the only way out of my trouble. O, Mr. Taylor, this is a wicked world, and money is almost a curse, for if it was not for money they would not care if I was as black as ink and said I was his wife; they would let it go. So now you may be called on to testify for me that Mr. S. told you I was his wife. I was married in New Orleans in '74, but have lost my license and can't find it. I should have written to you sooner, but I had such a surprise awaiting me that it prostrated me so that I have not had the heart to write. I have done nothing but pray for God to take me out of this world, where there is so little of holiness or truth, and where I have paid so dearly of late for the name of wife. O, how I hope there is a hereafter. Well, I reckon you are tired of this, but it is so nice to have a sympathizing friend to go to, and I would stake my life on you being my friend. But I will not bore you any longer. I am so proud to have met and supped with your family. It has made a deep impression upon me to know there is some truth and love in the world. Dear friend, enjoy it to its utmost while you can. And if I can speak higher of one of your family than another, I say I love deeply Miss E., and may the good Lord be ever near her. I hope to meet you all hereafter. Give them all my love, and accept a great portion for yourself. Don't show this to any one. I wish I could live near you and family. I believe I could forget the cruelty of the world and be contented until my time comes to be united to one that loved me, and feel all I am suffering now. Good-by; love to all. You can just write to me as I told you. I will get all letters. Your ever grateful friend,  "ANNIE SANDERS."

Mrs. Sanders: I don't remember what I wrote Mr. Taylor in those days. I told him to pay Mr. Newerth's debts.

"Mr. Taylor:                                        "MONROE, March 20.

"DEAR, KIND FRIEND—The Sanders estate will be settled up Monday. I am to be left a bare living. That is the price I get for my life's devotion—my life's great sacrifice. That is Louisiana's justice. I had to contend with eighteen men, I can not say gentlemen, for they have not got the first principles. I have been treated shamefully, given no showing whatever. I wish you would come and be here and give them a taste of a Texas man's opinion, and tell them what he said about them. They know that he hated them. Don't you think they want and are going to make me pay for his watch and pin and give one thousand, and they did not cost him one hundred. That is the greatest insult they could have offered me. I do not believe now they will give a dollar for a tomb, and they have his life's hard labor. Come and let them know I have one friend. I am too hurt to write more. Give my love to all and accept the same for yourself. Your friend,

                                        "ANNIE SANDERS."

"Mr. Taylor:                                        "MONROE, March 20.

"You have met Mr. Newerth, the bearer of this letter. Please help him in my behalf. He will tell you what he is going to do for me. I trust him implicity, for he was a true friend of Mr. S. Give him $1000 if you can possibly raise it, and if you can go with him I will be so glad. You will greatly oblige me by doing by me what you say you will. Yours in haste,                "ANNIE SANDERS."

                                        "MONROE, April 12.

"MY DEAR FRIEND—Our friend just arrived. I was so glad to see him back. He says he did not get your last telegram. He brought a copy of the certificate; could not get the original without more money. It is ready when you send draft or money. He says that it will be recorded in probate book, but can be seen. It is a very old man, Judge Young, justice of the peace there. There is nothing I can make out of it, only to put it in the statue's hand, and then every one will say, 'we have wronged her.' There has not been one dollar yet put aside for the tomb, and I do not think they will. I have company coming in. I do not feel at all well. Please send the money to St. Louis when you hear. The news has been scattered, but not by me. Now I will have to have the certificate with seal. Good-by. Your true friend,

                                        "A. S."

                                        "MONROE, May 12.

MY VERY DEAR FRIEND—I received your letter this morning. I was glad to hear from you. The reason I have not written to you is

because I have been looking for you. I can not tell you how I will come out in this case, but I am told it can be broken through, and I may get my rights yet. Mr. Mollincott has wrote to me three times, asking me for the money. He says send him a draft. You write to 112 North Broadway, and I think then he may get your letter. I will tell Mr. E. N. to write to you. Mr. S. says he will try to do something for me, but I do not believe him. O, Mr. Taylor, I do wish God would pity me and take me to my darling. I am so tired of life; it is a burden to me; time passes so slowly. O, if I only knew how he is now, and what he thinks of me.

"Well, I guess you are tired of this. I am not well, but I hope this will find all of you enjoying the best of health. Write to me soon and often, and tell me how all are, and do not fail to tell me of Miss Emily. I know you miss her so much. Well, good-by. Love to all; accept a large portion for yourself. Your loving friend,

"MRS. S. W. SANDERS."

"MONROE, May 3.

"*Mr. Taylor:*

"DEAR FRIEND—I have written to you, but not receiving an answer I could not think what was the matter with you that you would not answer. I have the papers all correct. I do not know whether they will do me any good or not, but I am pushing my lawyer to find out. There can be a flaw picked in the settlement. They have not complied with the agreement—there has not yet been one dollar put down for the tomb. Now, my lawyer says he will make them put $10,000 for it. Now I told them I must have my rights, and as it has gone so far I will try mighty hard to have them. The whole town is claiming for me and my rights. You would now feel proud of me. O, I do thank God I have found some friends that it does not take money to keep, and you, my dear, good, kind friend, are one of the truest I have. O, how I do prize it. I can never tell you, and always do hope to keep that love. Well, dear friend, I am not done with paying for this paper. I owe $250 to the same party that drew the last draft on you. Can you send it to him? His name is R. Mollincott, 1905 same street, St. Louis. It is the same that has drawn it all, but he used it upon the judge to refresh his memory about the marriage. He says when he wanted the last paper and had to record it he weakened, and he had to refresh his memory with that amount, which he gave out of his own pocket. Tell me how I stand with you—how much I owe you. I have been asked several times what my income up there is. I do not know, but I did not tell them so. Please let me know all about it. Please let the man have the money if you can. If our friend got the money he asked for he would be all right now, for he would have got here in time to have stopped settlement; but it is too late to grieve. I know you thought

you were doing for the best. God bless you for the trouble you have taken for me. Mr. S. does not like it very much that he has got to go before the court and swear that he has done me an injustice, but he says he will do so. Well, I believe I have told you all that will interest you by letter any way. Write to me as soon as you can. I was so afraid you was sick or mad with me, one. Thank God, it is neither.

"Your true friend,                    "A. S."

"MONROE, LA., April 10, '89.
"*Mr. O. P. Taylor, Texarkana, Texas:*

"DEAR FRIEND—I arrived to-day with marriage certificate. I am sorry that I did not get your letter nor dispatch. I asked you if I should come by Texarkana, but never got the word. How they missed my address, one of the largest houses in St. Louis, is a mystery to me. I have drawn on you for $350, which you will please honor.

"Yours respectfully,      "ED NEWERTH."

Annie Sanders (Mrs. Sanders): I was married in St. Louis shortly after Judge Young had taken the office, and I wanted to see him because I knew fraud had been practiced upon me. Ed Newerth was my friend and went there of his own free will. I told Mr. Taylor to pay Mr. Newerth's debts.

"MONROE, July 9.
"MY DEAR FRIEND—I received your letter and draft. Just came in time. I am compelled to go to St. Louis. There are many lawyers writing to the judge, and he does not know how to answer them, so he is scared to death. He says he wishes he had not done what he has, and must see me. Well, as long as he has joined in to help he ought to be made to stick to it. Don't you think so? So we must go up there. Will leave here on to-morrow evening's train. I will come by Texarkana. I do wish you could go with me, but if you can not I will have to go by myself; but I must see you and know what you think of it. I would not have Mr. B. to know the truth for anything. He is going up there soon to take the judge's testimony. He says he must see me before he says anything to any one, so I might as well go and end the matter. I want to get there before B. does. I can not say why he will not answer your letter, but will tell you more when I see you. I will be there to-morrow, but don't tell Mrs. T., for I can not stay, and we will not have any time to talk if you can't go with me. I hope you can; I trust you like I would God. Any way, you will tell me what to do and say. My dear friend, is life worth this trouble? I do thank you so much for your kindness. What would I do without you? Well, look for me on the 11th. Excuse bad writting, for I cut my thumb and I can hardly write at all good. I will be with you soon.

"Your truly loving friend,      "A. S."

In Rebuttal.—Mrs. Sanders, for the State:   I never presented a note to D. T. Leary to be cashed.   I never got a check from him for $1650, or for any other sum.   I signed several notes.   I signed them at Mr. Taylor's request, and left them in his charge in every instance.   That is my signature to note for $1650, and to the mortgage to secure it.   I never signed anything for him except in his office.   That is where I signed this note and left it in his charge.   Mr. D. T. Leary never gave me any check for money.   I never presented check for money to Inter-State National Bank.   Mr. Taylor never gave me check on the Inter-State National Bank in 1889.   I have never had such check in my possession; never drew money on it.   Mr. Taylor's manner was always respectful to me.   I don't remember signing note to him for $2000.   I have been to Mr. Taylor's residence; was carried there by Mr. Taylor, and his wife and daughter had been to the train with me to see me off. I went to see a fortune teller when I was in St. Louis.   Mr. Taylor went out and hunted up a fortune teller and told me he had his fortune told, and that she had told the truth.   I went to see the fortune teller at his request, and she told me I had a suit going on, and that there was one man interested me, and that I must take his advice in all things and trust him in all things and do as he told me to do.   She told me it was an old man, and that he thought as much of me as one of his own children.   She told me the name of the friend was Oliver. I told Mr. Taylor what she told me, and when I came to the "Oliver" part he said "that's me."   That was in July, 1889.   Mr. Taylor brought about the interview with Emma Clifton.   He told me she wanted to see me on important business, and he carried me to his office to see her and guarded the room while I was talking with her.   She told me I must get the power of attorney from Mr. Taylor.   I would not ask him for the power of attorney.   I saw her with him three times.   It was always about business.   She (Emma Clifton) had formerly lived in my husband's house in Monroe, La., for twenty years.   Mr. Taylor never said anything about having borrowed $1250 from Mr. Deutsch-man.   I never told him to keep anything off that account.   I applied to him personally to get settlement several times.   I never refused to go into a settlement with him.   The last interview I had with him was in his office.   At this interview, after he refused to settle with me, I told him he was a thief.   It was some time after he had the interview with me at my house.   Mr. Hardin heard a part of that interview at the house.

The defense:   I acknowledge everything I wrote to Mr. Taylor.   I wrote him letters, but don't remember what I ever wrote to him in those days.   I was married in St. Louis in 1875.

The State read in evidence letter of March 18, 1889, from defendant to Mrs. Sanders:

"OFFICE OF TAYLOR & CAMPBELL, REAL ESTATE DEALERS,
TEXARKANA, TEXAS, March 18, 1889.

*Mrs. S. W. Sanders, Monroe, La.:*

MY DEAR MADAM—Yours just received, and in the midst of a large pile of letters to be answered I choose out yours to answer you that at any time soever you may need me I am at your service. Truth is mighty and must prevail. Believing as I do that your cause is just, and that your title as a lawful wife is good and should be maintained, I will make any sacrifice to aid you if need be. I can conscientiously swear to the fact that Mr. Sanders told me of his marriage to you. The circumstances which brought up the conversation I well remember, also, and could clearly state if needed. I think you are too despondent. Be brave. With God and a clear conscience on your side you are safe. Then why trouble? You have a mission in life, and should feel it your duty to battle with all reverses rather than desire to shirk duty by death. I know it is hard, and sympathize deeply with you. But when you have done your duty bravely, be sure whatever befalls you will be for your best interest. I believe in the special guardianship of God as a father over us, and quite literally in the Bible. When we read that whatsoever we ask in his name, believing we shall receive it, I try to believe it and ask accordingly. But if I do not receive it I think it because our Father in Heaven, who love us as does our earthly father, sees best that I should not have it. Nothing good ever happens to us without being preceded by an apparent evil. The atmosphere is purified by destructive storms. You spoke of coming up. Do so; it will quiet your nerves to be away for a while. Write me what Mr. S. thinks now. Come up as soon as you can leave, without detriment to your business. Yours in true sympathy,          "O. P. TAYLOR."

Also the following letter:

"TEXARKANA, TEXAS, June 17, 1889.

"MY DEAR FRIEND: After getting your wire, I went to the post office and had that letter hunted up. * * * I was much relieved to hear from you and much pleased. * * * We are all well. Don't you bother your little self about what I said to you as to your too much talking. In the instance referred to I do not think the least harm is done. * * * I agree with you that it seems hard to keep silence when you have so much a life's sacrifice to talk of—like the Ancient Mariner, who must tell his tale or die. Yet you must remember that it is too much of a real romance, and at this time, when so many parties are pecuniarily interested in doubting its truth, it is best to say as little as possible. * * * Yours very sincerely,          "O. P. TAYLOR."

*P. A. Turner*, *Vaughn & Leary* and *Todd & Hudgins*, for appellant.

*R. H. Harrison*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE—A motion to quash the indictment, as well as a motion in arrest of judgment, were argued in the court below, which were overruled, and assignments of error bring these same matters before this court.

We quote from the indictment sufficiently to bring these questions in review. Among other things, the said indictment charges that: "O. P. Taylor was then and there the agent and attorney in fact of A. E. Sanders, a private person (who appointed said O. P. Taylor her said agent and attorney in fact under the name of A. E. Livingston), and the said O. P. Taylor did then and there fraudulently embezzle, misapply, and convert to his own use certain money belonging to the said A. E. Sanders without the consent of the said A. E. Sanders, viz., $2000, said money being of the value of $2000, which said money had come into the possession of the said O. P. Taylor by virtue of his said agency and employment as said attorney in fact for said A. E. Sanders."

The motion to quash this indictment was based upon two grounds, the first being that the money alleged to have been embezzled was not described, and the second that it should have been, but was not, alleged that a description could not be given of said money so embezzled.

Our Code of Criminal Procedure provides that "when it becomes necessary to describe property of any kind in an indictment, a general description of the same by name, kind, quantity, number, and ownership, if known, shall be sufficient." Code Crim. Proc., art. 427. The word "property," as used in the above cited article of the Code of Criminal Procedure, includes "money." Brown v. The State, 23 Texas Ct. App., 214. The word "money," where not specially defined by our statutes, includes metallic coins of all descriptions used as money as well as "that which is legal tender," as legal tender coins, or legal tender treasury notes of the United States. Lewis v. The State, 28 Texas Ct. App., 140; Sansbury v. The State, 4 Texas Ct. App., 99. "Money," when not specially defined, must be taken and construed in the sense in which it is usually understood in common language, taking into consideration the context and subject matter relative to which it is employed, but when that term is specially defined it shall be understood in that sense although it be contrary to its usual meaning. Penal Code, art. 10. The term "money" has no general definition set out in our codes, either the Penal or the Criminal Procedure. With reference to certain offenses it has been specially defined. Penal Code, arts. 789, 792.

With reference to the offense of embezzlement it has a specially defined meaning, and must be understood in the sense in which the Legislature has defined it, and is as follows, to-wit: "The term 'money,' as used in this chapter, includes besides gold, silver, copper, or other coin, bank bills, government notes, or other circulating medium current as money; and the term 'property' includes any and every article

commonly known and designated as personal property, and all writings of every description that may possess any ascertainable value." Penal Code, art. 789. These are statutory definitions of the terms "money" and "property," and they are very comprehensive, and relate to and are defined with special reference to the offense of embezzlement. "Money" is the general term, and includes all the species mentioned in its definition when embezzlement is the matter under investigation. When the indictment charges the embezzlement of "money" in its generic sense, and no further description is given of the said "money," there is necessarily included within that term all of the different kinds of money set out in article 789 of the Penal Code. Under such allegation the State can prove any character of money mentioned in said article. The money alleged to have been embezzled was sufficiently described in the indictment, and the court did not err in overruling the motion to quash.

Appellant's motion in arrest of judgment was based substantially upon the following grounds, to-wit: The indictment does not make it appear clearly who was acting "under the name of Livingston"— Mrs. Sanders, the principal, or appellant, the agent and attorney in fact; that the allegations do not make it certain that A. E. Sanders and A. E. Livingston are one and the same person; that it is not alleged that the money averred to have been embezzled was in the possession or under the care of the defendant as agent and attorney in fact at the time the same was embezzled and converted.

The first two grounds may be treated together, and are based upon the parenthetical clause "who appointed said O. P. Taylor her said agent and attorney in fact under the name of A. E. Livingston," contained in the indictment. The pleader was seeking to allege that Mrs. A. E. Sanders gave the appointment to appellant, not under her name as A. E. Sanders, but under the name of A. E. Livingston.

This was not a necessary allegation; it was not an averment descriptive of any of the parties, neither the principal nor agent, nor of the offense itself, and did not add to nor detract from the relations the parties sustained toward each other as principal on the one side and agent on the other. It was simply the narration of a fact or incident not descriptive of any person connected with the offense, nor of the offense itself. It may be eliminated from the indictment without affecting it, or the status of the parties thereto, or their relations to each other. Unnecessary words and allegations do not vitiate an indictment, and may be rejected as surplusage. Recitals which are neither repugnant nor contradictory to the body of the indictment, and which do not render unintelligible any of the material, traversable matters constituting the charge, may also be rejected as surplusage. Mayo v. The State, 7 Texas Ct. App., 342; Willson's Crim. Stats., sec. 1968. The parenthetical clause criticised by appellant may be eliminated as surplusage and yet

leave the charge in the indictment complete in stating, by proper aver-ments, the offense sought to be charged.

But if this view be incorrect, still the indictment upon this phase of it is sufficient. It sufficiently alleges that A. E. Sanders, under the name of A. E. Livingston, appointed appellant her agent and attorney in fact. The offense is charged "with sufficient legal accuracy to pre-vent the defendant from being prejudiced in his defense, and the of-fense charged in the indictment is defined by such circumstances as will enable him, should it be necessary, to plead a previous conviction or acquittal of the same offense." Gay v. State, 2 Texas Ct. App., 127. Tautology, repetition, bad spelling, incorrect grammar and want of rhetorical exactness and finish will not vitiate indictments "unless the words are so inartistically arranged as to make the charge uncertain." Willson's Crim. Stats., sec. 1991. The language in this case employed and criticised is not so uncertain and ambiguous as to mislead the ap-pellant, and it sufficiently conveys the idea that A. E. Sanders, and not the appellant, was meant where the name A. E. Livingston was used.

The remaining ground of the motion in arrest of judgment is that the indictment is fatally defective "because it does not allege that the money charged to have been embezzled by defendant was in his pos-session or under his care by virtue of his agency and employment as attorney in fact at the time of the conversion and embezzlement." The contention of appellant is that the indictment must not only allege that the money came into his hands or possession as agent by virtue of such agency, but that it must go further, and allege that it was so in his possession at the very time of the commission of the act which con-stitutes the offense, to-wit, the conversion of the property. In support of this proposition we are cited to The State v. Johnson, 21 Texas, 775, and Gaddy v. The State, 8 Texas Court of Appeals, 127. In Johnson's case our Supreme Court, Judge Roberts delivering the opinion of the court, said that "it is the breach of trust that constitutes the gist of the offense. Unless a duty or trust has been imposed there can be no breach of trust." Johnson was indicted, as clerk, for the embezzle-ment of money belonging to an Odd Fellows Lodge, but the indictment did not charge that it was his duty as such clerk to receive the money alleged to have been embezzled. The court further said that "it is not every officer of an institution that is incorporated who can be held lia-ble under this statute by converting unto his own use money of the in-stitution, but only such officers, clerks, or agents as have the money of their principal or employer, which shall have come to their possession, or shall be under their care, by virtue of said office, agency, or clerk-ship." The State v. Johnson, 21 Texas, 775. This trust relationship must exist at the time of the reception of the money by the agent or employe, or the money must be under the care of the agent by virtue of such agency or employment, in order to constitute the offense of em-

bezzlement. The other necessary matters must also exist. An agent who has nothing to do with the fiscal or monetary affairs of his principal, and who receives the money of his principal or may happen to have it otherwise than by virtue of his agency, can not be convicted for the offense of embezzlement under our statute. The reception of the money or property, or the care of it, as the case may be, by the employe, must be by virtue of his employment or agency for that purpose, and this must be alleged and proved. This is the extent and purport of the decisions in the Johnson case. In Gaddy's case this court said that "an indictment for this offense was held bad by our Supreme Court in The State v. Johnson, 21 Texas, 775, because it did not distinctly state that the defendant had the possession or care of the money by virtue of his clerkship when he converted it to his own use. Such allegation is required by all the standard precedents." Gaddy v. The State, 8 Texas Ct. App., 128, 129. This we understand to be the correct doctrine, and in strict accord with our statute defining the offense of embezzlement. But it does not follow from this that the indictment should go further and allege that the property or money that may have come into the agent's possession was in his custody at the time of the conversion. Our statute provides that the agent may be convicted for the embezzlement of such money or property of his principal as "may have come into his possession, or be under his care, by virtue of such office, agency, or employment." Penal Code, art. 786. The essential element of this portion of the definition of the offense is that the money or property must have come into the possession of the agent, and not that it shall be in his possession at the time of the conversion. The possession of the principal's money by the agent, and the subsequent conversion, are the necessary ingredients of this phase of the statute. "In order to sustain a prosecution for embezzlement against an agent of a private person or corporation, four distinct propositions of fact must be established in evidence beyond a reasonable doubt. These are as follows: 1. That the defendant was the agent of the person or corporation as alleged, and by the terms of his employment was charged with the duty of receiving the money of his principal. 2. That he did so receive money belonging to his principal. 3. That he received it in the course of his employment. 4. That he embezzled, misapplied, or converted it to his own use." Webb v. The State, 8 Texas Ct. App., 310; Leonard v. The State, 7 Texas Ct. App., 417; Huntsman v. The State, 12 Texas Ct. App., 619; Ex Parte Hadley, 31 Cal., 108.

In the indictment in the case in hand it is alleged that appellant was the agent and attorney in fact of his principal; that the money charged to have been embezzled came into his possession by virtue of his said agency and employment; that he misapplied, converted, and embezzled said money, and that the money belonged to and was the property of

his employer.    These allegations meet the requirements of the statute in so far as the questions urged by the motion criticise the indictment. It is not necessary to allege that the property was in the actual possession of the agent at the time of its embezzlement.   In so far as this phase of embezzlement is concerned, it is sufficiently met by the allegations that the money came into the possession of the agent and was thereafter converted by him.    Indictments in this State must charge by averments the offense denounced by the statute under which it is framed.    More than this is not required; less than this will not suffice. An indictment must charge the particular offense for which the conviction is sought, and with such certainty as will, if it should become necessary to do so, enable the party indicted to plead a conviction or acquittal thereunder in bar of a subsequent prosecution for that offense. When the indictment complies with these enumerated requirements it will be sustained.    Thus tested the indictment in this case is a legal and valid one, and sufficiently alleges the offense of embezzlement.

Appellant urges that the facts raised an issue upon which the court should have charged the misdemeanor phase of the law of embezzlement, and that, if embezzlement was proved at all, it was not shown that as much as $20 was converted at any one time.    To this we must withhold our assent.    We do not think the evidence raised this issue. The facts are too voluminous to be inserted in the opinion.    The facts show that the appellant obtained as agent large sums of money of his employer and converted same to his own use.    The case, in so far as the facts are concerned, is in some respects a very remarkable one. The appellant sought to defend himself largely upon the ground that his employer and himself were engaged in a conspiracy to obtain for his employer a false certificate of marriage in St. Louis to be used in the State of Louisiana in a law suit involving a large estate there.    He swears to the fact that he assisted Mrs. Sanders in bribing officers in St. Louis, and by means of that bribery obtained the desired marriage certificate.    He did this because he expected to be well. paid for it. For this work he testified he charged her $2450, but this is denied by her in so far as the pay is concerned, and she denies the fraud in the matter.    Appellant failed to account to Mrs. Sanders for the money that she says was realized upon the two notes, one for $1250 and the other for $1650.    Be this as it may, he, from his own showing, obtained a considerable amount of her money for which he fails to give any account so far as the record is concerned.    He made false statements of the financial affairs of his principal, thus leaving large sums in his hands unaccounted for.    The record shows that he studiously and systematically appropriated the money of his principal, and then gave untrue and false statements to her of the condition of her financial matters in his hands.    The court did not err in failing to charge upon

the inferior degree of the offense of embezzlement. The facts support the verdict of the jury. We find no reversible error in the record, and no sufficient reason is shown why the judgment should be set aside, and it is therefore affirmed.

*Affirmed.*

White, P. J., absent.